**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION, AKRON**

```
--------------------------------------------------------
In re:                                  :        Case No: 22-51200
                                        :
Vanguard Wines, LLC                     :        Chapter 11, Subchapter V
                                        :
an Ohio limited liability company,      :        Judge Alan M. Koschik
                                        :
                Debtor and              :
                Debtor-in-Possession.   :
                                        :
(Employer Tax I.D. No. 20-3247488)      :        Rel. Doc. Nos. 191 and 219
--------------------------------------------------------
```

## FIRST AMENDED PLAN OF REORGANIZATION OF VANGUARD WINES, LLC, DEBTOR AND DEBTOR IN POSSESSION, AS MODIFIED

Dated: May 23, 2023

Respectfully submitted,

**VANGUARD WINES, LLC**

 /s/  Eric Stewart
By: Eric Stewart, CEO, President and Treasurer


 /s/  Richard K. Stovall
Thomas R. Allen          (0017513)
Richard K. Stovall       (0029978)
James A. Coutinho        (0082430)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
T: (614) 221-8500     F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com;
coutinho@asnalaw.com
*Counsel for the Debtor and Debtor in Possession*

# Table of Contents

## Part 1 – Disclosure Information

I.    **Introduction** ..................................................................................................... 1
- A.    Overview and Purpose of this Document ............................................. 1
- B.    Explanation of Chapter 11 ................................................................... 2
- C.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing............. 2
- D.    How to Obtain Additional Information................................................. 2
- E.    Disclaimer ........................................................................................... 3

II.    **Background** ..................................................................................................... 3
- A.    Description and Pre-Chapter 11 History of the Debtor ........................ 3
- B.    Significant Events During the Chapter 11 Case ................................... 4
- C.    Insiders of the Debtor .......................................................................... 6
- D.    Management of the Debtor During the Chapter 11 Case....................... 6
- E.    Vanguard's Tangible Assets and Debt Structure ................................. 6
- F.    Other Events During the Chapter 11 Case ........................................... 7
- G.    Analysis of Potential Avoidable Transfers .......................................... 7
- H.    Reservation of Right to Object to Claims ............................................ 7
- I.    Current Financial Conditions .............................................................. 8
- J.    Current Operations .............................................................................. 8
- K.    Future Operations ................................................................................ 8

III.    **Summary of the Plan of Reorganization and Treatment of Claims and Interests** ..... 8
- A.    What is the Purpose of the Plan of Reorganization?............................ 8
- B.    Unclassified Claims ............................................................................ 9
  - 1.    Administrative expenses and fees............................................ 9
  - 2.    Priority tax Claims ................................................................... 9
- C.    Classes of Claims and Interests........................................................... 9
  - 1.    Classes of secured Claims ...................................................... 10
  - 2.    Classes of unsecured Claims................................................... 10
  - 3.    Class of Equity Interests ........................................................ 10
- D.    Means of Implementing the Plan ....................................................... 10
- E.    Benefits; Risk Factors ....................................................................... 10
- F.    Executory Contracts, Unexpired Leases and Franchise Relationships ................. 11
- G.    Tax Consequences of Plan ................................................................. 12

IV.    **Confirmation Requirements and Procedures** ........................................... 13
- A.    Who May Vote or Object ................................................................... 15
- B.    Liquidation Analysis ......................................................................... 16
- C.    Feasibility.......................................................................................... 16

V.    **Effect of Confirmation of Plan** .................................................................. 17
- A.    Discharge of Debtor .......................................................................... 17
- B.    Modification of Plan ......................................................................... 17
- C.    Final Decree ...................................................................................... 18

# Part 2 – The Plan

**Article 1.**     **Classification of Claims and Interests** ................................................ **19**

**Article 2.**     **Treatment of Administrative Expense Claims, Priority Tax Claims, And Certain Fees** ................................................................................ **19**
    2.01.     Unclassified Claims ................................................................................ 19
    2.02.     Administrative Expense Claims .............................................................. 19
    2.03.     Priority Tax Claims ................................................................................ 21
    2.04.     Statutory Fees ......................................................................................... 21

**Article 3.**     **Treatment of Claims and Interests Under the Plan** ........................... **21**

**Article 4.**     **Allowance and Disallowance of Claims** .............................................. **24**
    4.01.     Disputed Claim ....................................................................................... 24
    4.02.     Delay of Distribution on a Disputed Claim ............................................ 24
    4.03.     Settlement of Disputed Claims ............................................................... 24
    4.04.     Deadline to Object to Claims .................................................................. 24

**Article 5.**     **Provisions for Executory Contracts, Unexpired Leases and Franchise Relationships** .............................................................................. **24**

**Article 6.**     **Implementation and Distributions** ...................................................... **26**
    6.01.     Implementation ....................................................................................... 26
    6.02.     Selection of Officers and Board of Trustees Consistent with § 1123(a)(7) .......... 26
    6.03.     Vesting of Assets .................................................................................... 27
    6.04.     Subchapter V Trustee Provisions ........................................................... 28
    6.05.     Distributions ........................................................................................... 28
    6.06.     Suspension of Payments ......................................................................... 29
    6.07.     Default ..................................................................................................... 30

**Article 7.**     **General Provisions** ............................................................................... **30**

**Article 8.**     **Discharge** ............................................................................................... **32**

**Article 9.**     **Definitions** ............................................................................................. **32**

Schedule 5.01(a)     Franchise Agreements and Franchise Relationships to be Assumed
Schedule 5.01(b)     Franchise Agreements and Franchise Relationships to be Rejected
Schedule 5.01(c)     Executory Contracts and Unexpired Leases (Other than Franchise Agreements and Franchise Relationships) to be Assumed

Exhibit A     Liquidation Analysis
Exhibit B     Pro Forma

22-51200-amk    Doc 224    FILED 05/24/23    ENTERED 05/24/23 15:26:06    Page 3 of 47

# PLAN OF REORGANIZATION

Vanguard Wines, LLC, debtor and debtor in possession (the "Debtor" or "Vanguard"), submits this *First Amended Plan of Reorganization* (the "Plan") under section 1189(a) of the Bankruptcy Code (the "Code" or "11 U.S.C. § 1101 et seq."). The Debtor requests confirmation of the Plan under 11 U.S.C. §§ 1129 and 1191(a), and the filing of this Plan constitutes the request of the Debtor that the Court confirm the Plan on a nonconsensual basis under 11 U.S.C. § 1191(b), if necessary. All holders of Claims[1] and Interests entitled to vote to accept or reject the Plan should read the Plan in its entirety before voting to accept or reject the Plan.

The Debtor elected to proceed under subchapter V of chapter 11 of the Code. Under 11 U.S.C. § 1181(a) (eliminating the application of § 1125 to subchapter V cases), a separate disclosure statement is not required. Nevertheless, the Debtor has provided the information in Part 1 of this document and within the terms of the Plan (Part 2 of this document) that would traditionally be found within a disclosure statement, including the information required by 11 U.S.C. § 1190.

---

**Your rights may be affected. Read this Plan carefully. You may wish to consult an attorney about your rights and your treatment under the Plan.**

---

## Part 1 – Disclosure Information

## I.  Introduction

This is the first Plan submitted by the Debtor in this small business, subchapter V chapter 11 case. The first part of this document provides information about the Debtor necessary to assist interested parties in evaluating the Plan. The provisions of the Plan itself are contained in Part 2 of this document. Please read this entire document. While this Part 1 describes the Plan, the terms set forth in Part 2 control and will establish your rights if the Plan is confirmed by the Court.

### A.  Overview and Purpose of this Document

This Plan is being proposed by the Debtor for approval by the Court as to the restructuring of the Debtor's financial affairs. Part 1 provides the following information:

- Background of the Debtor and significant events during the bankruptcy case;
- An overview of the Plan structure;
- Who can vote on or object to the Plan;
- What factors the Court will consider when deciding whether to confirm the Plan;
- Why the Debtor believes the Plan is feasible, and how the treatment of your Claim under the Plan compares to what you would receive on your Claim in liquidation; and
- The effect of confirmation of the Plan.

---

[1] Capitalized terms are defined within this Plan and further set forth in Article 9 of the Plan.

22-51200-amk   Doc 224   FILED 05/24/23   ENTERED 05/24/23 15:26:06   Page 4 of 47

**B.      Explanation of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. There are different types of Chapter 11 designations. In this case, the Debtor has chosen to proceed under a subchapter V designation for small business debtors. Under subchapter V, a debtor is authorized to reorganize its business for its own benefit and that of its creditors and equity Interest holders. Formulation of a plan of reorganization is the principal purpose of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying Claims against or Interests in a debtor. After a plan of reorganization has been filed, it must meet the requirements for confirmation described below. Under subchapter V, only a debtor may file a plan.

**C.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan. The Court has entered a separate order setting forth various deadlines and related procedures for confirmation of the Plan, including the following information:

- the time and place of the hearing to confirm the Plan: **May 23, 2023, at 10:00 am Eastern Time** before the Honorable Alan M. Koschik, United States Bankruptcy Court, John F. Seiberling Building and U.S. Courthouse, 260 U.S. Courthouse, 2 South Main, Akron, Ohio 44308,

- the deadline for voting to accept or reject the Plan: **May 19, 2023, at 5:00 pm Eastern Time**, and

- the deadline for objecting to the confirmation of the Plan: **May 19, 2023, at 5:00 pm Eastern Time.**

**D.      How to Obtain Additional Information**

If you want additional information about the Plan, the Debtor, the bankruptcy case, or the voting procedure, you may contact counsel for the Debtor, Richard K. Stovall:

| | |
|---|---|
| Richard K. Stovall, Esq. | T: (614) 221-8500 |
| Allen Stovall Neuman & Ashton LLP | F: (614) 221-5988 |
| 10 West Broad Street, Suite 2400 | stovall@asnalaw.com |
| Columbus, OH 43215 | |

The Plan refers to documents that have been filed with the Court. Those documents may be obtained online through the Court's website, or requests for the same may be directed to the Debtor's counsel by sending a request to stovall@asnalaw.com.

2

### E. Disclaimer

There is no disclosure statement procedure in a subchapter V case, and therefore the Court has not approved this document as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms and how to vote on the Plan. You are advised to review the Plan carefully and consult with an attorney regarding your rights and obligations under this Plan. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has or will set a hearing for confirmation of the Plan does not constitute its endorsement of the Plan. There has been no approval of this document by the Court as of the date it was filed.

## II. Background

### A. Description and Pre-Chapter 11 History of the Debtor

Vanguard is a limited liability company organized under the laws of the State of Ohio, originally established in 2005. The business and affairs of Vanguard are managed by its members.

Vanguard is an independently owned importer and distributor of fine wines serving the Ohio, Kentucky and Indiana markets. Vanguard distributes high quality wines to the finest restaurants in these markets. Vanguard also distributes spirits in the Kentucky and Indiana markets. Vanguard operates primarily from its leased warehouse facility in Columbus, Ohio, as well as smaller leased facilities in Indianapolis, Indiana and Louisville, Kentucky.[2] On a company wide basis, Vanguard had 26 employees as of the filing of its chapter 11 case.

The filing of this case was precipitated by a variety of factors, the most significant being the loss of distribution to restaurant customers upon the onset of the COVID-19 pandemic at the end of the first quarter of 2020. For fiscal years 2017, 2018 and 2019 Vanguard's gross revenues totaled $7,366,498, $7,027,405 and $6,123,207, respectively. In 2020 Vanguard's gross revenue totaled $4,767,500. For 2021, it was $4,672,596. For 2022 (inclusive of nearly three months following the filing of its bankruptcy case), gross revenue was $3,068,695.

As Vanguard's revenue faltered, it was left in a precarious financial position. While government-provided pandemic programs were supportive, eventually Vanguard could not survive on its revenue collections. The liquidity provided under its asset-based lending facility became insufficient, and Vanguard had to turn to a factoring relationship relative to its accounts receivable.

---

[2] On September 29, 2022, as an expense reduction measure, Vanguard suspended the sales and marketing departments in Indiana, terminating its employee workforce in Indiana. The warehouse, delivery, and customer service associated with the Indiana market continue to operate through the employees located in Ohio and Kentucky.

3

As events unfolded during 2022, management concluded that the future of Vanguard might best be achieved through a strategic combination. After substantial discussions and negotiations, Vanguard reached an agreement, in principle, with Boutinot USA Inc., the American affiliate of Boutinot International (collectively "Boutinot"), a leading global wine producer and distributor, for the acquisition of Vanguard business and assets.

**B.      Significant Events During the Chapter 11 Case**

The Debtor commenced this case by filing a voluntary petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code on October 10, 2022 (the "Petition Date"). This case was originally filed to implement the anticipated Boutinot acquisition, subject to a court supervised sale process designed to provide an opportunity for the submission higher and better offers, for the benefit of Vanguard's creditor constituents, its customers and its employees. The anticipated sale timeline was developed to achieve a closing of the sale in early December 2022.

Significant resources were expended by the Debtor's principals and its professional advisors in developing the requisite sale platform and protocols, on both a pre-petition and post-petition basis, to ensure a robust and viable sale process capable of achieving Court approval by either the last week of November or the first week of December 2022. Indeed, docket entries in the case are replete with multiple filings largely—if not in some fashion, entirely—driven by the sale process. *See e.g.*, *Bid Procedures Motion* (Doc. 11); *Order Approving Bid Procedures* (Doc. 65); *Motion to Sell* (Doc. 66); *Notice of Bid Procedures, Auction Date and Sale Hearing (*Docs. 67 and 68); *Notice to Counterparties to Executory Contracts and Unexpired Leases* (Doc. 76); and *Report to Court* (Doc. 83).[3] And, on November 1, 2022, the Debtor entered into an Asset Purchase Agreement with Vanguard Wines Holdings, Inc., a wholly owned subsidiary of Boutinot.

In addition to the specific sale related motions and notices referenced above, the Debtor's financial plan and use of cash was centered around a sale process and closing of an asset sale in this case. In fact, the operating and cash collateral budget was reflective of the anticipated sale process, designed to achieve payment of the Claim of Crossroads Financial Group, LLC ("Crossroads"), the Debtor's senior lender, by the first week of December 2022. *See Motion (1) To Use Cash Collateral on an Interim and Final Basis; and (2) To Provide Adequate Protection to Crossroads Financial Group, LLC* (Doc. 10); *Agreed Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection* (Doc. 25); and *Agreed Final Order Authorizing the Use of Cash Collateral and Providing Adequate Protection* (Doc. 58) and the approved budget attached as Exhibit 1 thereto. In fact, the approved budget contemplated a wind-down and eventual close out of the Debtor's operations on a post-sale basis through the first week of January 2023.

Contemporaneously with these sale related filings in the bankruptcy case, the Debtor was attempting to attract qualified competing bids against the stalking horse bid of Boutinot to

---

[3] Parties are directed to the specific docket entries, as referenced, for a full and complete title to each motion, order, or notice – all of which have been abbreviated herein.

create a potential auction event for the benefit of the estate pursuant to the Court-approved bid procedures. The Debtor placed and ran multiple online advertisements in the *DailyDac*, a publication with over 10,000 subscribers consisting of professionals and brokers engaged in the distressed asset industry, as well as direct solicitation to various wine distributors throughout the country. Despite these efforts, no qualified competing bids were received by the bid deadline, November 23, 2022. As a result, the Debtor was prepared to proceed with the sale hearing on November 29, 2022, and, with Court approval, close the sale of its assets to Boutinot the next day, November 30, 2022.

However, a sudden and drastic change to these proceedings occurred on the day after Thanksgiving, Friday, November 25, 2022, when Boutinot advised the Debtor that, due to purported due diligence and financing concerns, it would no longer be proceeding with its purchase of the Debtor's assets. *See* Doc. 96. Consequently, on November 28, 2022, the Debtor filed a notice of withdrawal of the sale motion. (Doc. 95). The next day, November 29, 2022, the Debtor filed a *Supplemental Report to Court Under 11 U.S.C. § 1188(c)* (Doc. 96), detailing the unexpected events leading to Boutinot's termination of the sale.

After Boutinot's last minute termination of the sale, the Debtor, while operating in the normal course of its business, pivoted its focus to an internal financial restructuring of its business. The Debtor worked closely with Crossroads and with other investor candidates throughout the month of December 2022 to attract potential working capital on both near and long-term bases. Those efforts culminated in an agreement between RBR QL3 LLC (the "DIP Lender") and Crossroads for the acquisition of Crossroad's senior debt position. The Debtor and the DIP Lender then negotiated and reached agreement on the terms under which the DIP Lender would provide the Debtor with up to $100,000 of senior secured post-petition financing under a line of credit (the "DIP Financing"). The DIP Financing was approved by the Court, initially on an interim basis (Doc. 126), and eventually on a final basis (Docs. 144 and 145). Recently, the Court approved the Debtor's request to increase the DIP Financing by $250,000, bringing the total authorized DIP Financing up to $350,000 (Docs. 167 and 183). This additional financing provides the Debtor with additional liquidity to, *inter alia,* pay ongoing administrative expenses of the case, to acquire additional inventory, and manage cash flow of its operations during seasonal decreases in revenue.

The Debtor has also focused its efforts on formulating and filing this Plan. Because of the change in focus of this case from a sale transaction to an internal restructuring, the Debtor required additional time to finalize the Plan. The Debtor sought and obtained extensions of the statutory plan filing period from its initial deadline of January 8, 2023, to first, March 10, 2023 (Doc. 133), and then to April 14, 2023 (Doc. 176). This Plan is filed in accordance with these extensions.

**C.     Insiders of the Debtor**

From and after January of 2020, Eric Stewart and his wife, Mackenna Stewart, have been the only members of the Debtor. Mr. Stewart is also the Chief Executive Officer, President and Treasurer of the Debtor, and manages the Debtor's operations on a day-to-day basis.

**D.      Management of the Debtor during the Chapter 11 Case**

During this case, Mr. Stewart has continued to manage the Debtor under the advice of counsel and oversight by the Office of the United States Trustee (the "UST") and the subchapter V trustee, Patricia B. Fugee (the "Trustee").

**E.      Vanguard's Tangible Assets and Debt Structure**

Vanguard's predominant asset is its inventory stock of wines maintained at its warehouses and sold through its sales network in the Ohio, Kentucky and Indiana regions. As of the Petition Date, Vanguard's wine inventory was valued at approximately $1,148,700. Vanguard's assets also include a fleet of seven (7) Ford transit delivery vehicles having varying mileage and ranging from model years 2016 to 2021. The vehicles are financed through installment sales agreements and financing lease agreements. Vanguard's remaining assets consist of warehouse equipment and office furnishings at each of its leased facilities as described below.

Vanguard is a tenant of leased space within three facilities in Ohio, Indiana and Kentucky respectively. The Ohio facility, Vanguard's primary location, is located at 1020 W. Fifth Ave., Columbus, Ohio 43212 (the "Ohio Warehouse"). The Ohio Warehouse consists of approximately 17,775 square feet of warehouse space. The Indiana facility is located at 1761 N. Sherman Drive, Suite A, in the Brookside Industrial Park, Indianapolis, Indiana (the "Indiana Warehouse"). The Indiana Warehouse consists of approximately 2,880 square feet of warehouse space. The Kentucky facility is located at 11003 Bluegrass Parkway, Suite 430, Louisville, Kentucky 40299 (the "Kentucky Warehouse"). The Kentucky Warehouse consists of approximately 1,600 square feet of warehouse space.

Vanguard's debts consist of both secured and unsecured debt. The primary secured debt consists of obligations to the DIP Lender, under both the DIP Facility and the prepetition Claim acquired from Crossroads. The DIP Lender has filed a Proof of Claim (Claim No. 68) indicating that as of the Petition Date its prepetition secured Claim was in the aggregate amount of $1,038,240.60, with interest thereafter on the principal amount at the rate of 7.07% per annum. The Debtor's records reflect that as of April 14, 2023, the balance due the DIP Lender under the DIP Facility is approximately $148,000. The U.S. Small Business Administration ("SBA") may claim to have a secured debt in the approximate amount of $500,000, and Libertas Funding, LLC ("Libertas") may claim to have a secured debt in the approximate amount of $124,000. However, any claimed liens or security interests of these creditors are subordinate to the liens and security interests of the DIP Lender, which are the first and best liens against all of the Debtor's assets. There is no equity in the Debtor's assets over and above the balances owing to the DIP Lender. Consequently, the Plan treats the Claims of the SBA and Libertas as wholly unsecured Claims which are therefore included within Class 3 of the Plan. The remaining secured debt of the Debtor is comprised

6

of the purchase money security interests held by Ford Motor Credit Company ("FMCC") in the Ford transit vans that are included in the Debtor's delivery fleet. The aggregate amount owing on these obligations, whether designated as installment sales or financing lease agreements is approximately $21,285. The Debtor's unsecured debts are comprised generally of trade creditors, operating obligations (utilities, etc.), and several credit cards. The Debtor estimates that the total unsecured debt is $2,800,000 (inclusive of the obligations of the SBA and of Libertas).[4]

## F.     Other Events During the Chapter 11 Case

During the case, the Debtor has continued to manage its affairs and operate as a going concern. The Debtor has continued to pay its post-petition obligations in the ordinary course of its business.

The Debtor was authorized to employ bankruptcy counsel and completed all necessary filings and disclosures in the case. The Debtor attended an initial debtor interview with the UST and Trustee, and the Debtor appeared and testified concerning its assets and liabilities at the § 341 Meeting of Creditors. The Debtor has also filed its monthly operating reports. The Debtor also filed the report required under 11 U.S.C. § 1188(c) and appeared at a status conference before the Court.

March 6, 2023, at 4:00 p.m. prevailing Eastern time was the deadline for creditors that are not governmental units to file proofs of Claims, and April 10, 2023, at 4:00 p.m. prevailing Eastern time was the deadline for creditors that are governmental units to file proofs of Claims (Doc. 141).

## G.     Analysis of Potential Avoidable Transfers

In conjunction with the proposed sale of its asset to Boutinot, the Debtor undertook a preliminary analysis of payments made with 90 days prior to the Petition Date to its trade vendors that could fall within the parameters of transfers potentially avoidable under 11 U.S.C. § 547. Based on the Debtor's analysis the total of such payments is approximately $60,000.00. The Debtor has not undertaken any analysis of possible defenses that recipients of such payments may have or other related matters such as cost of litigating the legal issues and collectability, if successful. Moreover, the Debtor is not aware of any other transfers potentially avoidable under Chapter 5 of the Bankruptcy Code.

## H.     Reservation of Right to Object to Claims

Except to the extent that a Claim is already Allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to Claims. Therefore, even if your Claim is Allowed for voting purposes, you may not be entitled to a distribution if an objection to your Claim is later upheld.

---

[4] Due to the foreign nature of many of the Debtor's unsecured creditors, this total may be subject to revision based on the need to reconcile historical Euro/U.S. Dollar conversion rates with such rate in effect as of the Effective Date.

I.       **Current Financial Conditions**

The Debtor's primary asset continues to consist of its inventory stock of wines maintained at its warehouses with an approximate value of $604,000. The Debtor also has furniture, fixtures, and equipment (the "FF&E"); its bank accounts; and its intangible property. In terms of intangibles, the Debtor believes that there is intrinsic value to its trade name and the goodwill of the Debtor in the marketplace, as well as in the brands it represents. The value of such intangible assets is extremely difficult to quantify. The Debtor believes that its FF&E is worth approximately $51,000 at market value.

The identity and Petition Date fair market value of the estate's assets are listed in the Debtor's Schedule A/B. *See* Doc. 51. These valuations are based on the experience of Mr. Stewart and other employees of Vanguard. The Debtor reserves the right to modify these valuations (and amend or supplement this Plan) based on any appraisals or valuations that may be completed in the future. Currently, the Debtor does not anticipate obtaining any appraisal or valuations.

The Debtor's pre-petition financial statements were filed with the Court upon the filing of the case. *See* Doc. 1. As of the filing of the Plan, the most current monthly operating report filed by the Debtor is for the month of February 2023 as Doc. No. 164. A copy may be obtained from the Clerk of Courts or by contacting the Debtor's counsel.

J.       **Current Operations**

The Debtor's primary source of revenue is from the sale of its inventory. During the Chapter 11 Case the Debtor has averaged monthly receipts of $194,700.00 from the sale of its inventory. The Debtor's monthly operating expenditures (not inclusive of chapter 11 administrative expenses) have averaged $183,300.00. Detail of the Debtor's receipts and expenditures, on a monthly basis, can be found in the monthly operating reports filed in the Chapter 11 Case (Docs. 88, 106, 131, 155 and 164).

K.       **Future Operations**

The Debtor intends to continue to operate its business, and represent its brands, subsequent to confirmation of this Plan in a manner designed to maximize its profitability while at the same time enhancing its distribution reputation in the Ohio, Indiana and Kentucky markets.

## III.    Summary of the Plan of Reorganization and Treatment of Claims and Interests

A.       **What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places Claims and Interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims and Interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

**B.  Unclassified Claims**

Certain types of Claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of those Claims do not vote on the Plan. They may, however, object to the Plan if, in their view, their treatment under the Plan does not comply with the mandates of the Code. Therefore, the Debtor has not placed the following Claims in any class:

**1.  Administrative expenses and fees**

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are Allowed under § 503(b) of the Code. Administrative expenses include, for example, compensation for services and reimbursement of expenses awarded by the Court under § 330(a) of the Code (i.e., professionals employed by the Debtor with Court authorization), or post-petition obligations of the Debtor. Also included as an administrative expense in this case is the Debtor's obligation owing to the DIP Lender under the DIP Facility (Doc. Nos. 145 and 183). The principal balance owed under the DIP Facility is approximately $148,000 as of the date of this Plan. However, in accordance with the approved DIP Financing, the Debtor anticipates the balance due under the DIP Facility as of the Effective Date will be approximately $225,000. Under § 1191 of the Code, administrative expenses may be paid over the course of the Plan. The Code also requires that fees owed under section 1930 of title 28,[5] such as court fees, have been paid or will be paid. The parties entitled to administrative expense fee and cost reimbursements, once approved by the Court, include the Trustee and counsel for the Debtor, Allen Stovall Neuman & Ashton LLP ("ASNA"). To the Debtor's knowledge, there are no outstanding court costs or other unpaid court fees.

**2.  Priority Tax Claims**

Priority tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax Claim agrees otherwise, it must receive the present value of such Claim pursuant to 11 U.S.C. § 511, in regular installments paid over a period not exceeding 5 years from the Petition Date. No priority tax Claims have been scheduled or filed and the Debtor does not anticipate any such Claims will be filed.

**C.  Classes of Claims and Interests**

This section generally describes the classes set forth in the Plan. Please refer to the Plan for details of the proposed treatment of the classes.

**1.  Classes of secured Claims**

---

[5] Traditionally, this section would require the payment of quarterly fees to the UST. Those fees are not required in a subchapter V case, however.

Allowed Secured Claims are prepetition Claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent Allowed as secured Claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's Claim are less than the amount of the creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim. If no collateral value attaches to the creditor's Claim, the entire Allowed amount of such Claim will be classified as a general unsecured Claim. The following is a list of all classes containing Debtor's prepetition Claims that purport to be secured:

Class 2.1 – Secured Claim of RBR QL3, LLC
Class 2.2 – Secured Claim of Ford Motor Credit Company

2.     **Classes of unsecured Claims**

Unsecured Claims are not secured by property of the estate. There are two classes of unsecured Claims:

Class 1 – Classified Priority Claims
Class 3 – General Unsecured Claims.

3.     **Class of Equity Interests**

The membership Interests of Mr. and Mrs. Stewart in the Debtor are classified in Class 4.

D.     **Means of Implementing the Plan**

On a post-confirmation basis, the Debtor will fund its Plan payments primarily through revenues derived from the sale of its inventory, augmented by liquidity realized from draws on its post-petition credit facility which will be, essentially, a continuation of the DIP Facility previously approved by the Court (Doc. Nos. 145 and 183). Mr. Stewart will continue to manage the Debtor.

Distributions under the Plan will be made by the Debtor if the Plan is confirmed on a consensual basis (meaning all classes vote to accept the plan). If the Plan is not confirmed on a consensual basis, the Class 3 distributions will be completed by the Trustee but, in accordance with 11 U.S.C. § 1194(b), the Plan provides that the Debtor will make all other Plan distributions other than to Class 3, including all payments to the DIP Lender.

E.     **Benefits; Risk Factors**

The benefit of this Plan to the Debtor and its Interest holders is that it will allow a small business to continue operations while providing employment to at least 20 individuals, furthering the goals of subchapter V. The benefit to all creditors is that they will receive repayment of a portion of their Claims.

10

Nonetheless, the proposed Plan has the following risks:

1. The Debtor believes that it has accounted for the business difficulties arising from the COVID-19 pandemic. However, there are many unknowns related to the virus, including whether there may be new strains and whether the vaccines will be effective on any new strains. The Debtor cannot predict whether there will be additional government lockdown orders that affect its business.

2. The Debtor enjoys a strong reputation in its markets with respect to its services. The Debtor fully anticipates that this strong reputation will continue, and therefore it will continue to attract quality wine producers and retailers to engage its services. To the extent any incident occurs which would in any way tarnish its good name, business could decline, adversely impacting its revenue.

3. The Debtor has formulated its projections, in part, based on historical performance from a pre-COVID period and in part based on post-COVID results. Although the Debtor has made a significant effort to provide accurate projections, there is a possibility that the projections do not materialize as the Debtor expects.

F.    **Executory Contracts, Unexpired Leases and Franchise Relationships**

The Plan discusses executory contracts and unexpired leases in Article 5. Under the Plan, all executory contracts and unexpired leases, and all franchise agreements and relationships, that have not been assumed before the Effective Date, or that are not the subject of a pending motion to assume or reject as of the date of this Plan, if any, (defined under the Plan, collectively, as the "Plan Adjudicated Contracts, Leases and Franchises") will be treated as specified in the Plan.  Plan Adjudicated Contracts, Leases and Franchises listed in Schedule 5.01(a) of the Plan that constitute a franchise agreement or franchise relationship under Ohio Revised Code Section 1333.83 will be assumed by the Debtor on the terms and conditions as are stated in Schedule 5.01(a).  Plan Adjudicated Contracts, Leases and Franchises listed in Schedule 5.01(b) of the Plan that constitute a franchise agreement or franchise relationship under Ohio Revised Code Section 1333.83 will be rejected by the Debtor on the terms and conditions as are stated in Schedule 5.01(b). **Rejection of a franchise agreement or franchise relationship does not constitute termination of such agreement or relationship under applicable non-bankruptcy law.** Plan Adjudicated Contracts, Leases and Franchises not listed in Schedule 5.01(a) or Schedule 5.01(b) of the Plan will be assumed or rejected by the Debtor on the terms and conditions as are stated in Schedule 5.01(c).  Further, the Plan provides that the Debtor will be conclusively deemed to have rejected as of the Effective Date all Plan Adjudicated Contracts, Leases and Franchises not specifically assumed under the Plan. Proofs of Claim arising from the rejection of Plan Adjudicated Contract, Lease and Franchises must be filed no later than thirty (30) days after the date of entry of the order confirming the Plan**.**

**The Plan further provides relative to certain franchise agreements and relationships under Ohio Revised Code Section 1333.83 that were improperly purportedly**

11

terminated during this Case without relief from the automatic stay under Section 362(d) of the Bankruptcy Code that the Debtor does not acknowledge or recognize such purported termination, views such action as a nullity, and reserves and retains all rights and claims against the counterparties thereto and any party with whom they may have contracted, including claims for violation of the automatic stay under Section 362(a) of the Bankruptcy Code.

G.      **Tax Consequences of Plan**

Creditors concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors. The Debtor has not engaged in any analysis of possible tax consequences of the Plan and does not provide any advice related to those possible tax consequences.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code" or "IRC"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Services ("IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The implementation of the Plan may result in federal, state, local, or foreign income, excise or franchise tax consequences to the Debtor, to its bankruptcy estate (the "Estate"), and to its creditors. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan, and no tax opinion is given by this Disclosure Statement. Thus, no assurance can be given as to the interpretation that the IRS will adopt. The description of the consequences contained herein is provided for informational purposes only.

Furthermore, the discussion below covers only certain of the federal tax consequences associated with the Plan's implementation. This discussion does not attempt to comment on all aspects of the federal tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular creditor that may modify or alter the consequences described herein. This discussion does not address state, local or foreign tax consequences or the consequences of any federal tax other than federal income tax.

As a result of the numerous uncertainties concerning the income tax consequences of the Plan, there is no assurance of any kind that a particular taxpayer will, in fact, be entitled to the tax treatment described in this section of the Disclosure Statement. ***Creditors are strongly advised to consult with their own tax advisors regarding the tax consequences to them, to the Debtor, and to the Estate of the transactions contemplated by the Plan, including federal, state, local and foreign tax consequences.***

<u>IRS CIRCULAR 230 NOTICE</u>: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

In general, a creditor recognizes ordinary income under the Tax Code to the extent it receives cash or other property for interest, including original issue discount, or as a payment on account for goods or services, unless under its accounting method, such discount, interest or account payment has already been included in its taxable income and not written off as a bad debt deduction.

***The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.***

## IV.   Confirmation Requirements and Procedures

To be confirmable, the Plan must meet the requirements listed in 11 U.S.C. §§1191 and 1129 of the Code, with certain exceptions. These include the requirements that:

- the Plan must be proposed in good faith;
- the Plan must distribute to each creditor at least as much as the creditor would receive in a chapter 7 liquidation case, unless the creditor votes to accept the Plan; and
- the Plan must be feasible.
- Either: (a) if a class of Claims is impaired under the Plan, at least one impaired class of Claims must accept the Plan, without counting votes of insiders; or (b) the Court must find that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of Claims or Interests that is impaired under, and has not accepted, the Plan.

These requirements are not the only requirements listed in §§ 1129 and 1191 of the Code, and they are not the only requirements for confirmation.

The terms of the Plan differ in application based on whether the Plan is confirmed on a consensual basis (i.e., all voting classes accept the Plan) under § 1191(a) or a nonconsensual basis under § 1191(b) of the Code.

13

If the Plan is to be confirmed under § 1191(b), the Bankruptcy Code requires that the Court find that the Plan is "fair and equitable" with respect to each class of Claims or Interests that is impaired under, and has not accepted, the Plan. 11 U.S.C. § 1191(b). To be "fair and equitable" under that standard, the Plan must commit, as of the Effective Date, at least all of the "projected disposable income" of the Debtor to be received over three years, or such other period as the Court may fix up to five years. 11 U.S.C. § 1191(c)(2). The Bankruptcy Code defines "disposable income" to mean the income that is received by the Debtor and that is not reasonably necessary to be expended (1) for the maintenance or support of the debtor, or (2) for the payment of expenditures necessary for the continuation, preservation or operation of the business of the Debtor. 11 U.S.C. § 1191(d).

The Debtor has calculated its projected disposable income as set forth below. The projected disposable income was calculated on an annual basis as of the end of each Plan year. In preparing the pro forma that is attached to this Plan as <u>Exhibit B</u>, the Debtor further reviewed what its projected disposable income would be if it was calculated on a more frequent basis than annually. However, due to the intense seasonal nature of the Debtor's business (with projected negative or near-negative cash flow in the first and third calendar quarters of each year, followed by positive cash flow in the second and fourth calendar quarters of each year), it was impossible to accurately determine on a more frequent basis what funds were disposable income versus what funds were needed for the maintenance and support of the Debtor and necessary for the continuation, preservation, or operation of the business of the Debtor in order to have the Debtor maintain operations in the negative cash flow periods. Therefore, the Debtor believes that calculation of projected disposable income on an annual basis is appropriate because it accounts for both the high and low seasons of the Debtor's business in each Plan year.

The projected disposable income of the Debtor and, for comparison purposes, the total amount of Plan payments, are as follows:

| Plan Year | Projected Disposable Income[6] | Plan Payments (Not including Class 3)[7] | Class 3 Plan Payments | Total Plan Payments |
|---|---|---|---|---|
| 1 | $ 76,253.97 | $ 290,642.01 | $ 60,000.00 | $ 350,642.01 |
| 2 | $ 224,467.80 | $ 201,712.76 | $ 60,000.00 | $ 261,712.76 |
| 3 | $ 79,954.25 | $ 54,334.45 | $ 60,000.00 | $ 114,334.45 |
| TOTAL | $ 480,676.02 | $ 546,689.23 | $ 180,000.00 | $ 726,689.23 |

---

[6] The projected disposable income in this table was calculated by taking the sum of the figures in the pro forma on the line labeled "Net Income (Loss) Before Plan Payments".

[7] The pro forma projects that the Debtor will pay down the superpriority DIP line of credit from a starting principal balance of $225,000.00 on the Effective Date to paid in full within the first 18 months of the Plan. However, the Debtor projects a need to continue to use the line of credit in its ordinary course of business thereafter. The Debtor has included the paydown of the initial balance within the Plan payments calculation in this table because the balance due on the line of credit is a superpriority administrative claim, but the Debtor has not counted in its summation of Plan payments any further payments related to future line draws and payments of those future draws.

14

Based on the Debtor's calculations, the Plan proposes to pay creditors an additional $246,013.21 over and above the projected disposable income of the Debtor. Based on these facts, the Debtor has met the requirements under 11 U.S.C. § 1191(b) that the Plan provide treatment that is fair and equitable.

## A.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. Except as stated below, a creditor has a right to vote for or against the Plan only if that creditor has a Claim that is both Allowed (or Allowed for voting purposes) and impaired.

The Debtor has detailed in the Plan which classes are impaired, and thus are entitled to vote to either accept or reject the Plan, and which classes are not impaired, and are thus deemed to accept the Plan.

### 1.    What is an Allowed Claim?

Only a creditor with an Allowed Claim has the right to vote on the Plan. Generally, a Claim is Allowed if either a) the Debtor has scheduled the Claim on the Debtor's schedules, unless the Claim has been scheduled as disputed, contingent, or unliquidated, or b) the creditor has filed a proof of Claim, unless an objection has been filed to such proof of Claim. When a Claim is not Allowed, the creditor holding the Claim cannot vote on the Plan unless the Court, after notice and hearing, either overrules the objection or allows the Claim for voting purposes pursuant to Bankruptcy Rule 3018(a).

### 2.    What is an impaired Claim?

As noted above, the holder of an Allowed Claim has the right to vote only if it is in a class that is impaired under the Plan. As provided in 11 U.S.C. § 1124, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class

### 3.    Who is not entitled to vote?

The holders of the following five types of Claims and are not entitled to vote:

- holders of Claims that have been disallowed by an order of the Court;
- holders of other Claims that are not "Allowed Claims" (as discussed above), unless they have been "Allowed" for voting purposes;

15

- holders of Claims in unimpaired classes;
- holders of Claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;
- holders of Claims in classes that do not receive or retain any value under the Plan; and
- administrative expenses.

**Even if you are not entitled to vote on the plan, you have a right to object to the confirmation of the Plan.**

4.       **Who can vote in more than one class?**

A creditor whose Claim has been Allowed in part as a secured Claim and in part as an unsecured Claim, or who otherwise holds impaired Claims in multiple classes, is entitled to accept or reject a Plan in each capacity and should cast one ballot for each Claim.

**B.       Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan on their Claims as they would receive in a hypothetical chapter 7 liquidation. A liquidation analysis is attached to this Plan as <u>Exhibit A</u>. Based on this analysis, the Debtor believes that this confirmation requirement is met because there would not be any distribution to unsecured creditors in a hypothetical chapter 7 liquidation.

**C.       Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor to the Debtor unless such liquidation or reorganization is proposed in the Plan. This requirement is commonly called the "feasibility" requirement.

The Debtor must show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. The Debtor has provided projected financial information. Those projections are set forth in the pro forma attached to the Plan as <u>Exhibit B</u>. These projections reflect that the Debtor will be able to make the Plan payments. The Debtor believes that its pro forma projections represent an accurate prediction of the financial performance of the Debtor over the course of the Plan.

## V.       Effect of Confirmation of Plan

**A.       Discharge of Debtor**

The discharge of the Debtor is dependent on whether the Plan is confirmed on a consensual basis or a nonconsensual basis.

**Discharge under a Consensual Plan**: If the Plan is confirmed on a consensual basis, on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in 11 U.S.C. § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt (i) imposed by the Plan; or (ii) to the extent provided in 11 U.S.C. § 1141(d)(6).

**Discharge under Nonconsensual Plan**: If the Plan is confirmed on a nonconsensual basis, as soon as practicable after completion by the Debtor of all payments due within the first 3 years of the Plan, the Debtor will apply to have the Court grant the Debtor a discharge of all debts provided in 11 U.S.C. § 1141(d)(1)(A) and all other debts Allowed under 11 U.S.C. § 503, except that the Debtor will not be discharged of any debt (i) on which the last payment is due after the first 3 years of the Plan; or (ii) of the kind specified in 11 U.S.C. § 523(a).

**B.      Modification of Plan**

The Debtor—and only the Debtor—may modify the Plan at any time before confirmation of the Plan. However, the Court may require re-voting on the Plan.  The Debtor may also seek to modify the Plan at any time after confirmation only if:

    A. If the Plan has been confirmed on a consensual basis under § 1191(a):

        (1) the Plan has not been substantially consummated;
        (2) the Plan as modified meets the requirements of 11 U.S.C. §§ 1122 and 1123, except for subsection (a)(8) of such § 1123; and
        (3) the Court, after notice and a hearing, determines that circumstances warrant the modification and confirms the plan as modified under 11 U.S.C. § 1191(a).

    B. If the Plan has been confirmed on a nonconsensual basis under § 1191(b):

        (1) the modification is within the first three years of the Plan;
        (2) the Plan as modified meets the requirements of 11 U.S.C. § 1191(b); and
        (3) the Court, after notice and a hearing, determines that circumstances warrant the modification and confirms the plan as modified under 11 U.S.C. § 1191(b).

**C.      Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor will file a motion with the Court to obtain a final

decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

*[Part 2 Begins on Following Page]*

## Article 1:    Classification of Claims and Interests

In accordance with § 1123(a) of the Code, all Claims and Interests are placed in the classes set forth below. A Claim or Interest is classified in a particular class only to the extent that the Claim or Interest qualifies within the description of that class and is classified in a different class to the extent that any remainder of the Claim or Interest qualifies within the description of the different class. A Claim or Interest is in a particular class only to the extent that the Claim or Interest is Allowed.

| | |
|---|---|
| Class 1 | All Allowed C**laims entitled to priority** under § 507(a) of the Code (except administrative expense Claims under § 507(a)(2) and priority tax Claims under § 507(a)(8)). |
| Class 2.1 | The prepetition secured Claim of **RBR QL3, LLC** . |
| Class 2.2 | The Claim of **Ford Motor Credit Company** to the extent Allowed as a secured Claim under § 506(a) of the Code. |
| Class 3 | All **general unsecured Claims** Allowed under § 502 of the Code. |
| Class 4 | All **equity Interests** in the Debtor. |

## Article 2:    Treatment of Administrative Expense Claims, Priority Tax Claims, and Certain Fees

| | | |
|---|---|---|
| 2.01 | **Unclassified Claims** | Under section § 1123(a)(1), administrative expense Claims and priority tax Claims are not in classes. |
| 2.02 | **Administrative expense Claims** | Each holder of an administrative expense Claim Allowed under § 503 of the Code will be paid in full as follows: |
| | | (1) If the Claim is Allowed by that time, on the Effective Date; |
| | | (2) Within ten business days of the allowance of the Claim, if it is Allowed after the Effective Date; or |

19

(3) upon other terms as may be agreed upon by the holder of the Claim and the Debtor.

All Claims for administrative expenses, other than arising under the DIP Facility or such Claims arising in favor of trade creditors in the ordinary course of the Debtor's business, but including fee applications, must be filed with the Court under 11 U.S.C. § 503(b) and served on all parties by the Administrative Expense Claim Deadline. Failure to file an administrative expense Claim by the Administrative Expense Claim Deadline will result in the holder of the Claim being forever barred from asserting the Claim, except as provided in the Plan.

With respect to repayment of the DIP Facility, the pro forma attached as <u>Exhibit B</u> reflects the payments to be made by the Debtor pursuant to the agreed upon repayment terms with the DIP Lender which generally will consist of monthly interest payments, repayment of principal from cash flow (subject to re-advancement); and maturity at 36 months from the Effective Date.

The Debtor anticipates the following may be filed as administrative expense Claims:

a) Allen Stovall Neuman & Ashton LLP
   Attorney fees
   Estimate: $290,000

b) Patricia B. Fugee
   Subchapter V Trustee Fees
   Estimate: $18,000

As set forth in the projections, ASNA and the Debtor have agreed to a payment schedule that will permit the Debtor to retain sufficient funds to make all required Plan payments. Further, the Trustee and the Debtor have agreed to a payment schedule, as set forth in the projections to pay the Trustee's fees over a period of three (3) months from the Effective Date.[8]

The Debtor does not project making any other administrative expenses payments on the Effective Date because the Claims have either not yet been Allowed or are disputed.

---

[8] The reflective payments set forth in the pro forma (Exhibit B) of the administrative expense Claims to ASN&A and to the Trustee are net of the provisional payments already made to such claimants and are estimated, subject to final allowance by the Court.

20

| 2.03 | **Priority tax Claims** | Each holder of a priority tax Claim will be paid in accordance with § 1129(a)(9)(C) of the Code. Each holder will receive payment in full of the total value of its Claim, with interest at the applicable governmental rate, split into equal monthly payments starting with the first day of the first full month following confirmation and ending on the date that is 5 years from the Petition Date. The final payments on these Claims will be for the remaining balance owed on the respective Claims with interest. |
| | | |
| | | The Debtor does not believe there are any priority tax Claims. No Claims have been filed by any governmental unit. |
| 2.04 | **Statutory fees** | All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the Effective Date of this Plan have been paid or will be paid on the Effective Date. The Debtor believes all fees have been paid as of the date this Plan is being submitted. There are no UST fees in a subchapter V case. |

## Article 3: Treatment of Claims and Interests Under the Plan

Claims and Interests will be treated as follows under this Plan:

| Class | Impairment | Class Name |
|---|---|---|
| **Class 1** | Unimpaired | **Priority Claims** excluding those in Article 2 |

**Class 1 Treatment:**

Class 1 is unimpaired by this Plan, and each holder of a Class 1 priority Claim will be paid in full, in cash, upon the later of the Effective Date of this Plan, or the date on which the Claim is Allowed by a final non-appealable order.

The Debtor does not believe there are any Class 1 Claims.

**Class 1 Voting:** Class 1 is unimpaired, deemed to accept, and not entitled to vote.

| **Class 2.1** | Impaired | **Secured Claim of RBR QL3, LLC** |
|---|---|---|

**Class 2.1 Overview:**

Claimant: RBR QL3, LLC
Collateral: Blanket
Priority of Lien: Senior, first and best (subject to DIP Facility liens)
Claim Amount: $1,038,240.60, plus interest

21

**Class 2.1 Treatment:**

**Secured Claim Amount**: $1,038,240.60

**Payment Interval**:          Monthly payment of interest, in arrears, at the rate of 4% per annum commencing the 15th day of September 2023 and continuing on the same date of each successive month thereafter through the later of 36 months from the Effective Date, or entry of a final decree and order closing this case ("Maturity"). Interest accruing from the Effective Date through August 15, 2023 shall not be paid, but instead added to the principal balance of the Claim.

**Maturity**:                    At Maturity, the Debtor shall refinance $400,000 of such Claim with Claimant, and the balance thereof converted to a 50% membership interest in the Debtor.

**Treatment of Lien**:        The Claimant will retain its blanket lien on all of the Debtor's assets up to the amount of its secured Claim.

   **Class 2.1 Voting:** Class 2.1 is impaired and entitled to vote.

| Class 2.2 | Impaired | Secured Claim of Ford Motor Credit Company LLC |
|---|---|---|

**Class 2.2 Overview:**

Claimant:          Ford Motor Credit Company, LLC ("FMCC")
Collateral:          Three Ford Vans:
       a.   2016 Ford Transit T-250 (VIN: 1FTYR1ZM0GKA55759)
       b.   2017 Ford Transit Connect (VIN: NM0LS7E70H1311386)
       c.   2017 Ford Transit T-250 (VIN: 1FTYR1ZM6HKB37240)
Priority of Lien:   Senior PMSI liens
Claim Amount:    $21,140.02

**Class 2.2 Treatment:**  The secured Claim of FMCC will be paid in accordance with the terms and provisions of Ohio Vehicle Retail Installment Contracts attached as exhibits to Proof of Claim Nos. 19, 27 and 28, respectively (collectively, the "Van Contracts"), filed herein on behalf of the Claimant, with the exception that the maturity date for each Van Contract is extended from the Effective Date for a period of eighteen (18) months (the "New Maturity Date").  FMCC will receive 18 consecutive monthly payments, commencing in the first month during which the Effective Date falls, in an amount equal to the principal balance due under each Van Contract, with interest as provided under each such Contract, but reflective of the extended repayment term hereunder.  FMCC will retain its liens on the collateral securing its Claims.

Notwithstanding the foregoing, on or within 30 days following the Effective Date, the Debtor will sell the following two Ford Vans:   2016 Ford Transit T-250 (VIN:

1FTYR1ZM0GKA55759) and 2017 Ford Transit T-250 (VIN: 1FTYR1ZM6HKB37240) (collectively, the "Sale Vans") free and clear of the liens of FMCC, and FMCC shall receive all sale proceeds to the extent necessary to pay the balances due FMCC on its Claims secured by the Sale Vans. To the extent there remain any excess sale proceeds following payment of the balances due on the Sale Vans, those excess proceeds will be paid to FMCC and applied to the outstanding balance on the remaining Van Contract for the Ford Van retained by the Debtor.

**Class 2.2 Voting:** Class 2.2 is impaired and entitled to vote.

| Class 3 | Impaired | **General Unsecured Claims** |
|---|---|---|

### Class 3 Overview:

Class 3 is the class for general unsecured Claims. General unsecured Claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

Claimants: All general unsecured Claims. The claimants also include creditors, other than RBR QL3, LLC, that may have held a pre-petition secured Claim against the Debtor, including but not limited to the SBA and Libertas Funding.

Claims Estimate: The Debtor calculates that there are $2,800,000.00 in Class 3 Claims.

### Class 3 Treatment:

Holders of Allowed Claims in Class 3 will receive their pro-rata share of $180,000 (the "Class 3 Distribution"). The Debtor will make a monthly deposit of $5,000 (the "Class 3 Monthly Deposit") into a segregated interest-bearing bank account maintained by the Debtor (or, if the Trustee is the disbursing agent under the Plan, to the Trustee) (the "Class 3 Escrow Account'). The Debtor (or the Trustee) will make six (6) semi-annual distributions, each in the amount of $30,000, commencing six (6) months after the Effective Date to holders of Allowed Claims in Class 3 from the Class 3 Escrow Account and continuing every six (6) months thereafter until the end of the Plan term. The proposed Class 3 Distribution will be the same regardless of whether the Plan is confirmed on a consensual or nonconsensual basis. For the purpose of clarity, a distribution under this class treatment will be timely made provided that it is mailed by the last day of each 6-month period within the Plan commitment period.

This treatment will pay a total of $180,000 to unsecured creditors over the three-year commitment period. The Debtor estimates this will result in a distribution of approximately 6.4%.

No interest will be paid on Class 3 Claims.

**Class 3 Voting:** Class 3 is impaired under the Plan and is entitled to vote.

| Class 4 | Unimpaired | Equity Interests |
|---------|------------|------------------|

**Class 4 Treatment:**

Class 4 contains the membership Interests of Mr. and Mrs. Stewart. They will retain their respective membership Interests.

**Class 4 Voting:** Class 4 is unimpaired and not entitled to vote.

## Article 4:    Allowance and Disallowance of Claims

| 4.01 | **Disputed Claim** | A *disputed Claim* is a Claim that has not been Allowed or disallowed by a final non-appealable order, and as to which either: |
|------|--------------------|--------------|
|      |                    | i.  a proof of Claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or |
|      |                    | ii. no proof of Claim has been filed, and the Debtor has scheduled the Claim as disputed, contingent, or unliquidated. |
| 4.02 | **Delay of distribution on a disputed Claim** | No distribution will be made on account of a disputed Claim unless such Claim is Allowed by a final non-appealable order. |
| 4.03 | **Settlement of disputed Claims** | The Debtor will have the power and authority to settle and compromise a disputed Claim with court approval and compliance with Federal Rule of Bankruptcy Procedure 9019. |
| 4.04 | **Deadline to Object to Claims** | All objections to Claims must be filed by the Claim Objection Deadline. |

## Article 5:    Provisions for Executory Contracts, Unexpired Leases, and Franchise Relationships

24

| 5.01 | **Assumption and rejection of Plan Adjudicated Contracts, Leases and Franchises** | The Plan Adjudicated Contracts, Leases and Franchises, that being all executory contracts and unexpired leases, and all franchise agreements and relationships, that have not been assumed before the Effective Date, or that are not the subject of a pending motion to assume or reject as of the date of this Plan, if any, will be treated under the Plan as follows: |

a. those Plan Adjudicated Contracts, Leases and Franchises that constitute a franchise agreement or franchise relationship under Ohio Revised Code Section 1333.83 and are listed in **Schedule 5.01(a)** hereto shall be assumed by the Debtor on the terms and conditions as are stated in Schedule 5.01(a);

b. those Plan Adjudicated Contracts, Leases and Franchises that constitute a franchise agreement or franchise relationship under Ohio Revised Code Section 1333.83 and are listed in **Schedule 5.01(b)** hereto shall be rejected by the Debtor on the terms and conditions as are stated in Schedule 5.01(b), **provided, however, that rejection of such franchise agreement or franchise relationship shall not constitute termination of such agreement or relationship under applicable non-bankruptcy law**; and

c. all Plan Adjudicated Contracts, Leases and Franchises not listed in Schedule 5.01(a) or Schedule 5.01(b) shall be assumed, or rejected, on the terms and conditions as are stated in **Schedule 5.01(c)**.

The Debtor will be conclusively deemed to have rejected all Plan Adjudicated Contracts, Leases and Franchises not specifically assumed hereunder as of the Effective Date. A proof of a Claim arising from the rejection of a Plan Adjudicated Contract, Lease and Franchise must be filed no later than 30 days after the date of the entry of the order confirming this Plan.

The Debtor submits there are no cure costs to be paid to any counterparty to a franchise agreement or franchise relationship listed in Schedule 5.01(b) upon assumption as there are no defaults. If there is a dispute related to a Plan Adjudicated Contract, Lease or Franchise to be assumed regarding (1) the amount of any payments to cure a default under, (2) the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or (3) any other matter pertaining to assumption, any related cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a final order resolving the dispute and approving the assumption.

25

Neither the exclusion nor inclusion of any Plan Adjudicated Contract, Lease or Franchise on any of Schedules 5.01(a), 5.01(b) or 5.01(c), nor anything contained in this Plan, shall constitute an admission by the Debtor that any such contract, lease or franchise is in fact an executory contract or unexpired lease or that the Debtor has any liability thereunder. If there is a dispute regarding whether a contract, lease or franchise is or was executory at the time of assumption or rejection, the Debtor shall have 30 days following entry of a final order resolving such dispute to alter its treatment of such contract, lease or franchise under the Plan.

**With respect to any Plan Adjudicated Contracts, Leases and Franchises that constitute a franchise agreement or franchise relationship under Ohio Revised Code Section 1333.83, whether included in Schedule 5.01(a) or Schedule 5.01(b), that was purportedly terminated subsequent to the Petition Date under applicable non-bankruptcy law, including under Ohio Revised Code Section 1333.85, without having first obtained relief under Section 362(d) of the Bankruptcy Code, the Debtor does not acknowledge or recognize such purported termination, views such action as a nullity, and reserves and retains all rights and claims against the counterparties thereto and any party with whom they may have contracted, including claims for violation of the automatic stay under Section 362(a) of the Bankruptcy Code.**

## Article 6:    Implementation and Distributions

6.01  **Implementation**  Payments to be made under this Plan will be made from the funds of the Debtor existing as of the Effective Date, as well as funds generated after the Effective Date from operations of the Debtor's business. Funds may also be available from the Debtor's pursuit of any avoidance actions available to it under Chapter 5 of the Bankruptcy Code, if any, should the Debtor choose to pursue any such claims.

6.02  **Selection of Officers and Board of Trustees consistent with § 1123(a)(7)**  After the Effective Date, the Debtor will continue its practice of electing officers, directors, and trustees in accordance with the provisions of Ohio's Revised Limited Liability Company Act, R.C. § 1706.01, *et seq*. All officers and directors will serve in accordance with applicable non-bankruptcy law. In particular, Mr. Stewart will continue to serve as the Chief Executive Officer, President and Treasurer of the Debtor.

26

6.03 **Vesting of Assets**  The vesting of the Debtor's assets back to the Debtor is dependent on whether the Plan is confirmed on a consensual basis or a non-consensual basis.

**Vesting under Consensual Confirmation:**
Except as otherwise provided in this Plan or in the Confirmation Order, as of the Effective Date if the Plan is confirmed on a consensual basis under 11 U.S.C. § 1191(a), all property of the Debtor shall vest in the reorganized Debtor free and clear of all liens, claims, interests or other encumbrances in accordance with 11 U.S.C. § 1141(b). On or after the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, the reorganized Debtor may operate its business and may use, acquire, or dispose of property without supervision or approval of the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**Vesting under Nonconsensual Confirmation:**
If the Plan is confirmed on a nonconsensual basis under 11 U.S.C. § 1191(b), property of the Debtor's post-confirmation estate will include, in addition to the property specified in section 541 of the Bankruptcy Code:

(1) all property of the kind specified in section 541 of the Bankruptcy Code that the debtor acquires after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, whichever occurs first; and

(2) earnings from services performed by the Debtor after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, whichever occurs first.

Upon closure of the case (other than for administrative purposes), property of the estate shall vest in the reorganized Debtor free and clear of all liens, claims, interests or other encumbrances except as provided in the Plan. On or after the Effective Date, except as otherwise provided in the Plan or Confirmation Order, the reorganized Debtor will remain in possession of the property of the estate in accordance with 11 U.S.C. § 1186(b), and may operate its business and may use, acquire or dispose of property with the supervision or approval of the Trustee and the Bankruptcy Court.

27

| | | |
|---|---|---|
| 6.04 | **Subchapter V Trustee Provisions** | **A.    Consensual Confirmation** |

Under 11 U.S.C. § 1183(c), if the Plan is confirmed on a consensual basis, the Trustee's services will be terminated on the date that the Plan is substantially consummated.

**B.    Nonconsensual Confirmation**

If the Plan is confirmed on a nonconsensual basis, the Trustee's services shall be terminated after the final distribution to Class 3 under the Plan.

If the Plan is confirmed on a nonconsensual basis, the Trustee will be the disbursing agent under the Plan for all distributions to Class 3. The Debtor will, in accordance with 11 U.S.C. § 1194(b), be the disbursing agent for all other Plan payments. As to the Trustee's distributions, the following provisions will apply:

   i.    The Trustee will make the Class 3 Plan payments by the last day of each six-month period in the Plan commitment period.

   ii.   The Debtor will pay to the Trustee the Class 3 Monthly Deposits by the 15th day of each month.
   iii.  The Debtor will provide any information to the Trustee that is reasonably requested in relation to the determination of any distribution.

   iv.   The Trustee will continue to be compensated for her services under 11 U.S.C. § 330. The Trustee will file fee applications with the Court at least once a year but not more frequently than every one hundred twenty (120) days. The Debtor will remit payment within thirty (30) days of approval of any fee application or at such other time as agreed to by the Trustee and the Debtor.

| | | |
|---|---|---|
| 6.05 | **Distributions** | Unless otherwise stated, any monthly payment by the Debtor under the Plan will be made by the last day of the month starting with the month in which the Effective Date falls. |

The first Class 3 distribution under the Plan will be made by the last day of the sixth month after the Effective Date.

Subject to Bankruptcy Rule 9010, distributions will be sent to:

i. the addresses set forth on the proofs of Claim filed with the Court;

ii. if no proof of Claim was filed, the address set forth in the schedules; or

iii. the addresses set forth in any written notices of address change filed with the Court.

If any distribution is returned as undeliverable, the Trustee or the Debtor, as applicable, will file a notice with the Court indicating that the distribution was returned as undeliverable and requesting an updated address. No further distributions to that claimant will be made until a notice is filed with the Court updating the claimant's address. When the notice of a new address is filed, all distributions owed to the claimant will be made without interest. Claims for undelivered distributions must be claimed within six (6) months of the date of the Debtor or Trustee filing the notice of undeliverable distribution. After that date, the unclaimed distribution be paid to the Clerk of Court as unclaimed funds and the claimant will no longer be entitled to participate in future distributions under the Plan. Any future amount that would have gone to the claimant will be allocated *pro rata* to the remaining claimants.

Checks issued for distributions will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the disbursing agent but must be made within 120 days of the date the distribution was sent. If no request is timely made for the reissuance of a check, the funds will be paid to the Clerk of Court as unclaimed funds.

If any payment to a creditor in any given quarter would be less than $50.00, the Trustee or the Debtor, as applicable, is authorized to hold that payment until the next quarter and pay both installments at the same time.

| 6.06 | **Suspension of Payments** | If payments under a non-consensual plan are made by the Trustee, the Debtor may apply to the Court for suspension of payments due to circumstances for which the Debtor may not be held accountable. Notice of such request for suspension of payments shall be given to the Trustee, the UST and all affected parties. The Court, after notice and a hearing may suspend the payments for not more than 90 days. Such suspension shall extend the length of the term of the Plan by the term of the suspension, but will not increase the term or the total number of |

payments of the Plan and will not be permitted if it would extend the Plan past five years. A suspension merely tolls when the next payment will be made.

Notwithstanding the foregoing, no suspension of payments will be permitted for payments to RBR QL3, LLC.

| | | |
|---|---|---|
| 6.07 | **Default** | This provision is being made in accordance with § 1191(C)(3)(B): If the Debtor fails to make a payment under this Plan, any creditor (or the Trustee if the Debtor defaults on a Class 3 deposit payment) may send notice by certified or overnight mail to the Debtor, the Trustee, and the UST of the default in payment, copying the Debtor's counsel. The Debtor will have 30 days from its receipt of the notice to cure any default in it making Plan payments. If the Debtor does not timely cure the payment default, secured and unsecured creditors shall not be bound by the discharge injunction (if the Plan was confirmed on a consensual basis under § 1191(a)) or the automatic stay (if the Plan was confirmed on a nonconsensual basis under § 1191(b)), as the case may be and without a court order, as to their collateral and may proceed against any security interests. The rights of unsecured creditors shall be restored to proceed against the Debtor for the total amount of the debt owed, minus any payment received under the Plan and limited by any applicable discharge in the context of a consensual confirmation. |

## Article 7:    General Provisions

| | | |
|---|---|---|
| 7.01 | **Code definitions and rules of construction** | The definitions and rules of construction set forth in §§ 101, 102, & 1182 of the Code will apply when terms defined or construed in the Code are used in this Plan. |
| 7.03 | **Severability** | If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan. |
| 7.04 | **Binding effect** | The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity. |
| 7.05 | **Captions** | The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan. |

| 7.06 | **Controlling effect** | Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Ohio govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan. |
|---|---|---|
| 7.07 | **Retention of Jurisdiction** | Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Court retains its existing exclusive jurisdiction over all matters arising in or out of or related to the Case or the Plan pursuant to §§ 105(a) and 1142 of the Code. |
| 7.08 | **Corporate Charter Provision** | As a limited liability company, the Debtor does not issue any equity securities. Therefore, the requirement under 11 U.S.C. § 1123(a)(6) related to inclusion of certain terms in the corporate charter is not applicable. |
| 7.09 | **Exculpation and Limitation of Liability for Professionals** | On the Effective Date, the Debtor and all holders of Claims against and Interests in the Debtor will be conclusively deemed to release all professionals retained by order of the Bankruptcy Court in the Chapter 11 Case and all of such professionals', respective officers, directors, employees, principals, partners and agents, and all officers and directors of the Debtor holding such offices at any time through the Effective Date from all liabilities, claims, costs, damages and expenses, except for Claims arising from fraud, willful misconduct or gross negligence to such persons, arising out of the Chapter 11 through the Effective Date. |
| 7.10 | **Retention of Causes of Action** | The Debtor shall retain, subsequent to the Effective Date, any and all claims, demands, and causes of action, including, without limitation, all of the claims of a kind specified in §§ 544, 547, 548, 549, 550, 551, and 553(b) of the Code, and in relation to any breach of the automatic stay, accruing prior to the Effective Date in respect of the Debtor against any person or entity (collectively, the "**Retained Actions**"). The Debtor may, in its sole discretion, determine to prosecute or release any such Retained Actions and if prosecuted, compromise and settle such Retained Actions on such terms as it deems reasonable with no further notice to holders of Allowed Claims being necessary and without need for Bankruptcy Court approval in accordance with Rule 9019. The Debtor may retain such professionals as it may determine, and on such terms and conditions as it may determine, without the need for approval by the Court under § 327 of the Code, or otherwise. Any professional so retained may be compensated, and its expenses may be reimbursed, by the Debtor without the need for approval by the Court under §§ 330 or 331 of the Code, or otherwise. Any net proceeds collected from Retained Actions will be applied to make payments under this Plan. |

31

## Article 8:    Discharge

8.01    The discharge of the Debtor is dependent on whether the Plan is confirmed on a consensual basis or a non-consensual basis.

**Discharge under a Consensual Plan**: If the Plan is confirmed on a consensual basis, on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in 11 U.S.C. § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

(i) imposed by the Plan; or
(ii) to the extent provided in 11 U.S.C. § 1141(d)(6).

**Discharge under Nonconsensual Plan**: If the Plan is not confirmed on a consensual basis, as soon as practicable after completion by the Debtor of all payments due within the first three years of the Plan, the Debtor will apply to have the Court grant the Debtor a discharge of all debts provided in 11 U.S.C. § 1141(d)(1)(A) and all other debts Allowed under 11 U.S.C. § 503, except that the Debtor will not be discharged of any debt:

(i) on which the last payment is due after the first three years of the Plan; or
(ii) of the kind specified in 11 U.S.C. § 523(a).

## Article 9:    Definitions

In addition to the terms specifically defined above, the following definitions are used within the Plan:

| | | |
|---|---|---|
| 9.01 | **Administrative Expense Claim Deadline** | Requests for payment of administrative expense Claims are required to be filed no later than 60 days after the Effective Date. |
| 9.02 | **Allowed** | "Allowed" means, with respect to any Claim: |
| | | i.  a Claim, proof of which was filed on or before the date designated by the Court as the last date for filing proofs of Claim with respect to such Claim, or |
| | | ii.  a Claim that has been or hereafter is scheduled by the debtor as liquidated in amount or not disputed or contingent and, is scheduled by the debtor as liquidated in amount and not disputed or contingent and, in either case, a Claim as to which no objections to the allowance thereof has been filed. |
| 9.03 | **Claim Objection Deadline** | All Claim objections must be filed no later than 60 days after the Effective Date. |

32

| | | |
|---|---|---|
| 9.04 | **Claims** | "Claim" or "Claims" means: |

        i.    right of payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

       ii.   a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

| | | |
|---|---|---|
| 9.05 | **Confirmation Order** | The order entered by the Court confirming the Plan. |
| 9.06 | **Effective Date** | The effective date of this Plan is the first day after the first full month after the month in which the Confirmation Order is entered. For clarity and as an example, if the Confirmation Order is entered on May 25, the Effective Date will be July 1. |
| 9.07 | **Interests** | "Interest" or "Interests" means (i) the ownership interests in the Debtor and (ii) any right or option, however arising, to acquire an ownership interest or any other equity interest in the Debtor. |
| 9.08 | **Substantial Consummation** | "Substantial Consummation" occurs on the first business day after the first distribution is made under the Plan, regardless of to which class the distribution is made. |

Respectfully submitted,

VANGUARD WINES, LLC

 /s/  Eric Stewart                  
By: Eric Stewart, Chief Executive Officer, President and Treasurer

33

  /s/  Richard K. Stovall
Thomas R. Allen      (0017513)
Richard K. Stovall    (0029978)
James A. Coutinho   (0082430)
Allen Stovall Neuman & Ashton LLP
10 West Broad Street, Suite 2400
Columbus, OH 43215
T: (614) 221-8500    F: (614) 221-5988
allen@asnalaw.com; stovall@asnalaw.com;
coutinho@asnalaw.com
*Counsel for the Debtor and Debtor in Possession*

34

**Schedule 5.01(a)**

<u>Franchise Agreements and Franchise Relationships to be Assumed</u>

| Business Name |
| --- |
| LILLIAN |
| CHAMPAGNE R.H. COUTIER |
| AZIENDA AGRICOLA CAMPOGRANDE |
| AZIENDA AGRICOLA ELIO ALTARE DI SILVIA ALTARE |
| BODEGAS ARRAEZ |
| BODEGAS TRADICION |
| CRUSE WINE CO |
| DE MAISON SELECTIONS |
| DIRUPI |
| DOMAINE ALPHONSE MELLOT |
| DOMAINE DU CAYRON |
| DOMAINE DU HAUT BOURG |
| FERDINAND WINES |
| FLANEUR WINES |
| HALCYON WINES LLC |
| HUDSON WINE BROKERS |
| LE COLTURE AZ. AGR. DI RUGGERI CESARE & CSS |
| LEROY, INC |
| LES LUNES WINES LLC |
| MAISON FOUCHER-LEBRUN |
| MAS DES BROUSSES |
| SCHERRER WINES |
| SIRO PACENTI |
| TURLEY WINE CELLARS |
| PATRICK MCNEIL WINES d/b/a WINES THAT DELIVER |
| EVESHAM WOOD VINEYARD & WINERY LLC |
| HADEN FIG LLC |
| PARK STREET IMPORTS/CARLO HUBER SELECTIONS |

**Schedule 5.01(b)**

<u>Franchise Agreements and Franchise Relationships to be Rejected</u>

36

| Business Name |
| --- |
| USA WINE WEST/ALLAMAND |
| MANDRAKE WINES, LLC |
| BOUTINOT |
| THE CRAFT SPIRITS COOPERATIVE |
| USA WINE WEST/BIELER FAMILY WINES |
| VIGNERONS DE NATURE |
| MATCHVINO |
| ELENTENY IMPORTS/CRAZY BEAUTIFUL WINES |
| DOMAINE LA GUINTRANDY |
| R. STUART & CO. WINERY |
| VINTAGE '59 |
| LATTA WINES |
| SCRIBE WINERY/AKA WINES LLC |
| USA WINE WEST/GOTHAM PROJECT |
| USA WINE IMPORTS/PARES BALTA |
| MHW, Ltd./WHANAU IMPORTS |
| MHW, Ltd./HB WINE MERCHANTS |
| SAINTSBURY |
| FAVIA ERICKSON WINEGROWERS LLC |
| ROOTED SELECTIONS |
| CALIFORNIA FINE WINES LLC |
| VALCKENBERG INTERNATIONAL |
| MORNE WINE COMPANY/BROOKS WINERY |
| ELENTENY IMPORTS/EKLEKTIKON |
| FAMILY & FARMERS |
| VIEUX VINS INC d/b/a RARE WINE CO |
| PENCE VINEYARDS & WINERY/RANCH |
| EHREN JORDAN WINE CELLARS d/b/a FAILLA WINES |
| EHREN JORDAN WINE CELLARS d/b/a DAY WINES |
| PAZO DO MAR |
| CROCKER & STARR |
| CANTINA DEL TABURNO |
| MAITRE DE CHAI LLC |
| GIANFRANCO ALESSANDRIA |
| FREIRE LOBO |
| AZ AGR di GRAZIANO PRÀ |
| AZUR WINES |
| ARNOT-ROBERTS WINES |
| MICHAEL SULLBERG WINES |
| BARON FAMILY WINE |
| KAMEN WINES |
| LA CAUDRINA |
| LINGUA FRANCA |
| POTT WINES |
| BODEGAS BHILAR, S.L. |
| ISLE SAINT-PIERRE SARL |
| MAURO VEGLIO |
| CHAMPAGNE AGRAPART & FILS |
| BODEGAS EXOPTO |
| KISMET WINE INC. (Once & Future Wines) |
| BIG TABLE FARM |
| PETER FRANUS WINE COMPANY |
| POUR MANAGEMENT LLC |
| VALDESPINO |

| Business Name |
| --- |
| ANTIQUUM FARM |
| CANTINA HORUS |
| HUNTER GLENN |
| BECKHAM ESTATE VINEYARD |
| IGNIOS ORIGENES |
| ZRS WINES LLC |
| LE DOMAINE D'HENRI |
| PURLIEU |
| DOMAINE GAUJAL DE SAINT BON |
| USA WINE WEST/ORCHARD LANE |
| KONGSGAARD WINES |
| LAIL VINEYARDS |
| SCEV VADIN PLATEAU |
| FATTORIA LA RIVOLTA |
| CHATEAU MOURGUES DU GRES |
| HARPER VOIT |
| RIO MAGGIO |
| CA'ROSSA |
| MAS D'EN GIL |
| FINE DISREGARD WINE CO. |
| AKA WINES LLC/THE WONDERLAND PROJECT |
| ADEGA ALGUEIRA |
| CANTINA FRATELLI CARAFOLI |
| HUDSON WINES |
| JUSTIN GIRARDIN |
| DOMAINE DE PAJOT |
| GUY ALLION |
| REVANA FAMILY PARTNERS LP/REVANA VINEYARDS |
| REVANA FAMILY PARTNERS LP/CORAZON DEL SOL |
| REVANA FAMILY PARTNERS LP/ALEXANA WINERY |
| DOMAINE LA VILLAUDIERE |
| ARKENSTONE VINEYARDS |
| LANG & REED WINE COMPANY |
| MS WINES LLC/MARTHA STOUMEN WINES |
| LAGIER MEREDITH WINES |
| BOSCO DEL MERLO |
| DOMAINE de L'HORTUS |
| ANTICA TERRA |
| ROBERT FOLEY VINEYARDS |

**Schedule 5.01(c)**

<u>Executory Contracts and Unexpired Leases (Other than Franchise Agreements and Franchise Relationships) to be Assumed</u>

| | Name of Counter Party | Nature of Agreement | Cure Amount |
|---|---|---|---|
| 1. | 1020 West Fifth Ave., LLC | Ohio Warehouse Lease | $54,391.25[9] |
| 2. | Brookside Owner LLC | Indiana Warehouse Lease | $0.00 |
| 3. | KAS Commonwealth, LLC | Kentucky Warehouse Lease | $0.00 |
| 4. | Ford Motor Credit ("FMCC") | Commercial Van Leases (4) | $22,027.93[10] |

---

[9] The cure amount scheduled will be adjusted in June 2023 to reflect the Debtor's share of the utilities due under the lease for the month of May. The Debtor and 1020 West Fifth Ave., LLC have agreed that this cure amount will be paid in seven (7) equal monthly installments of $7,770.18 plus one seventh (1/7th) of May utilities charge, commencing in June, 2023 and continuing through December, 2023.

[10] The Debtor proposes to cure this amount in 12 equal monthly installments, commencing on the Effective Date and continuing for one year thereafter. Notwithstanding the foregoing, the Debtor will pay all remaining lease payments, arrearages, and any lease-end charges on or within thirty (30) of the Effective Date with respect to the following Ford van: 2019 Ford Transit T-250 (VIN: 1FTYR1CN1KKB42202). As a result of these payments, the arrearage associated with this van lease ($4,791.12) will correspondingly reduce the above-stated cure amount. Further, to the extent any excess proceeds remain from the disposition of this vehicle following such payments, those proceeds will be paid to FMCC to as a further reduction of the above-stated cure amount.

37

Liquidation Analysis
Vanguard Wines, LLC

---

**Assets**

| | | |
|---|---|---:|
| a. | Cash on hand (approximated for time of possible liquidation) | $5,000 |
| b. | Accounts Receivable | $35,000 |
| c. | Inventory | $604,000 |
| d. | Fixtures, furniture and equipment | $51,000 |
| e. | Automobiles | $0 |
| f. | Building and land | $0 |
| g. | Customer list | $0 |
| h. | Investment property (such as socks, bonds or other financial assets) | $0 |
| i. | Lawsuits or other claims against third parties | $0 |
| j. | Other intangibles (such as avoidance actions) | $61,000 |

**Total Assets at Liquidation Value** $771,000

| | |
|---|---:|
| Less: Senior Secured creditor recovery | ($710,000) |
| Less: Super-priority administrative claim of DIP lender recovery | ($61,000) |
| Less: Chapter 7 trustee fees and expenses* | - $0 |
| Less: Chapter 11 administrative claims | - $0 |
| Less: Priority claims, excluding administrative expense claims | - $0 |

| | |
|---|---:|
| (1) Balance available for distribution to unsecured claims | $0 |
| (2) Total dollar amount of estimated unsecured claims | $2,800,000 |

**Percentage of claims which unsecured creditors would receive or retain in a chapter 7 liquidation:** 0%

**Percentage of claim which unsecured creditors will receive or retain under the Plan:** **6.4%**

*Assumes a Chapter 7 Trustee will not administer any assets because they are all subject to validly perfected liens of senior secured creditor.

**Vanguard Wines**
**Plan Pro Forma**

| Summary | July 2023 | August 2023 | September 2023 | October 2023 | November 2023 | December 2023 |
|---|---|---|---|---|---|---|
| **Monthly Projections through end of 2023** | | | | | | |
| **Cash Balance Summary** | | | | | | |
| **Beginning Cash Balance** | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Income | 300,000 | 350,000 | 350,000 | 400,000 | 450,000 | 400,000 |
| Operating Expenses | -257,423 | -329,998 | -327,723 | -374,923 | -418,623 | -357,973 |
| **Net Income (Loss) Before Plan Payments** | 42,577 | 20,002 | 22,277 | 25,077 | 31,377 | 42,027 |
| Less Plan Payments | -19,724 | -18,572 | -21,962 | -19,460 | -19,423 | -19,343 |
| **Net Income (Loss) After Plan Payments** | 22,853 | 1,431 | 315 | 5,617 | 11,955 | 22,684 |
| **Ending Cash Balance** | 72,853 | 51,431 | 50,315 | 55,617 | 61,955 | 72,684 |
| | | | | | | |
| **LOC Transactions** | | | | | | |
| **Minimum Operating Capital Reserve** | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| **Starting LOC Principal Balance** | 250,000 | 227,147 | 225,716 | 225,401 | 219,784 | 207,829 |
| Principal Payment to (Draw Down from) LOC | 22,853 | 1,431 | 315 | 5,617 | 11,955 | 22,684 |
| **Ending LOC Principal Balance** | 227,147 | 225,716 | 225,401 | 219,784 | 207,829 | 185,145 |
| **Cash Balance Carry Forward to Next Period** | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| | | | | | | |
| **Income Detail** | | | | | | |
| Cash Sales | 240,000 | 280,000 | 280,000 | 320,000 | 360,000 | 320,000 |
| Collections from Receivables | 60,000 | 70,000 | 70,000 | 80,000 | 90,000 | 80,000 |
| **Total Income** | 300,000 | 350,000 | 350,000 | 400,000 | 450,000 | 400,000 |
| | | | | | | |
| **Operating Expense Detail** | | | | | | |
| **Payroll Expenses** | | | | | | |
| Gross wages & payroll taxes | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 |
| Commissions | 12,500 | 15,000 | 17,500 | 19,250 | 22,000 | 24,750 |
| Payroll expenses (401(k), etc.) | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 |
| **Total Payroll Expenses** | 78,750 | 81,250 | 83,750 | 85,500 | 88,250 | 91,000 |
| | | | | | | |
| **Costs of Goods Expenses** | | | | | | |
| Payments to Wine Suppliers | 120,000 | 180,000 | 180,000 | 220,000 | 240,000 | 200,000 |
| Inbound Transportation | 12,000 | 18,000 | 18,000 | 22,000 | 24,000 | 20,000 |
| Excise Tax | 9,000 | 10,500 | 10,500 | 12,000 | 13,500 | 12,000 |
| **Total Cost of Goods Expenses** | 141,000 | 208,500 | 208,500 | 254,000 | 277,500 | 232,000 |
| | | | | | | |
| **Other Expenses** | | | | | | |
| Ford Van Lease Expense | 1,981 | 1,981 | 1,981 | 1,981 | 1,981 | 1,981 |
| Misc Purchases | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| IT Services | 500 | 500 | 500 | 500 | 500 | 500 |
| Insurance PPE | 3,000 | 3,000 | | | 15,000 | |
| Rent | 13,192 | 13,192 | 13,192 | 13,192 | 13,192 | 13,192 |
| Utilities | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 |
| Accounting & Legal (Post Confirmation) | | | | | | |
| Insurance Health/Life | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 |
| Taxes (CAT, real estate, etc.) | | 2,400 | | | 2,400 | |
| Speedway Gas | 4,200 | 4,375 | 5,000 | 4,950 | 5,000 | 4,500 |
| **Total Other Expenses** | 37,673 | 40,248 | 35,473 | 35,423 | 52,873 | 34,973 |
| | | | | | | |
| **Total Operating Expense** | 257,423 | 329,998 | 327,723 | 374,923 | 418,623 | 357,973 |
| | | | | | | |
| **Plan Payments** | | | | | | |
| **Administrative Expense Claims** | | | | | | |
| Interest on DIP LOC | 1,667 | 1,514 | 1,505 | 1,503 | 1,465 | 1,386 |
| Chapter 11 Legal Fees | | | | | | |
| Subchapter V Trustee Fees | 2,500 | 2,500 | 2,500 | | | |
| Other Accrued Expenses | 1,000 | | | | | |
| **Total Administrative Expense Claims** | 5,167 | 4,014 | 4,005 | 1,503 | 1,465 | 1,386 |
| | | | | | | |
| **Cure Payments** | | | | | | |
| Ohio Rent Cure Payments | 7,770 | 7,770 | 7,770 | 7,770 | 7,770 | 7,770 |
| Ford Van Lease Cure Payments | 1,436 | 1,436 | 1,436 | 1,436 | 1,436 | 1,436 |
| **Total Cure Payments** | 9,207 | 9,206 | 9,206 | 9,206 | 9,206 | 9,206 |
| | | | | | | |
| **Classified Claim Payments** | | | | | | |
| Class 2.1 - Senior Lender Interest | | | 3,400 | 3,400 | 3,400 | 3,400 |
| Class 2.2 - Ford Van | 351 | 351 | 351 | 351 | 351 | 351 |
| Class 3 - General Unsecured | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| **Total Classified Claim Payments** | 5,351 | 5,351 | 8,751 | 8,751 | 8,751 | 8,751 |
| | | | | | | |
| **Total Plan Payments** | 19,724 | 18,572 | 21,962 | 19,460 | 19,423 | 19,343 |

1 of 3

**Vanguard Wines**
**Plan Pro Forma**

**Quarterly Projections from 1/2024 through final Plan payment**

| Summary | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 | Q1 2025 | Q2 2025 | Q3 2025 |
|---|---|---|---|---|---|---|---|
| **Cash Balance Summary** | | | | | | | |
| Beginning Cash Balance | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Income | 553,500 | 1,014,750 | 1,291,500 | 1,752,750 | 636,525 | 1,166,962 | 1,485,225 |
| Operating Expenses | -610,511 | -957,717 | -1,260,241 | -1,489,211 | -773,638 | -1,109,560 | -1,450,203 |
| Net Income (Loss) Before Plan Payments | -57,011 | 57,033 | 31,260 | 263,540 | -137,113 | 57,402 | 35,022 |
| Less Plan Payments | -42,035 | -58,746 | -54,471 | -54,233 | -50,047 | -31,290 | -30,768 |
| Net Income (Loss) After Plan Payments | -99,046 | -1,713 | -23,212 | 209,306 | -187,160 | 26,112 | 4,254 |
| Ending Cash Balance | -49,046 | 48,287 | 26,788 | 259,306 | -137,160 | 76,112 | 54,254 |
| | | | | | | | |
| **LOC Transactions** | | | | | | | |
| Minimum Operating Capital Reserve | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Starting LOC Principal Balance | 185,145 | 284,190 | 285,903 | 309,114 | 99,808 | 286,968 | 260,856 |
| Principal Payment to (Draw Down from) LOC | -99,046 | -1,713 | -23,212 | 209,306 | -187,160 | 26,112 | 4,254 |
| Ending LOC Principal Balance | 284,190 | 285,903 | 309,114 | 99,808 | 286,968 | 260,856 | 256,602 |
| Cash Balance Carry Forward to Next Period | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| | | | | | | | |
| **Income Detail** | | | | | | | |
| Cash Sales | 442,800 | 811,800 | 1,033,200 | 1,402,200 | 509,220 | 933,570 | 1,188,180 |
| Collections from Receivables | 110,700 | 202,950 | 258,300 | 350,550 | 127,305 | 233,392 | 297,045 |
| **Total Income** | 553,500 | 1,014,750 | 1,291,500 | 1,752,750 | 636,525 | 1,166,962 | 1,485,225 |
| | | | | | | | |
| **Operating Expense Detail** | | | | | | | |
| **Payroll Expenses** | | | | | | | |
| Gross wages & payroll taxes | 192,000 | 192,000 | 192,000 | 192,000 | 211,200 | 211,200 | 211,200 |
| Commissions | 30,443 | 55,811 | 71,033 | 105,165 | 35,009 | 70,018 | 89,114 |
| Payroll expenses (401(k), etc.) | 6,750 | 6,750 | 6,750 | 6,750 | 6,750 | 6,750 | 6,750 |
| **Total Payroll Expenses** | 229,193 | 254,561 | 269,783 | 303,915 | 252,959 | 287,968 | 307,064 |
| | | | | | | | |
| **Costs of Goods Expenses** | | | | | | | |
| Payments to Wine Suppliers | 220,000 | 500,000 | 750,000 | 900,000 | 350,000 | 600,000 | 880,000 |
| Inbound Transportation | 22,000 | 50,000 | 79,000 | 110,000 | 25,000 | 60,000 | 92,000 |
| Excise Tax | 16,605 | 30,443 | 38,745 | 52,583 | 19,096 | 35,009 | 44,557 |
| **Total Cost of Goods Expenses** | 258,605 | 580,443 | 867,745 | 1,062,583 | 394,096 | 695,009 | 1,016,557 |
| | | | | | | | |
| **Other Expenses** | | | | | | | |
| Ford Van Lease Expense | 5,983 | 5,983 | 5,983 | 5,983 | 5,983 | 5,983 | 5,983 |
| Misc Purchases | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| IT Services | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Insurance PPE | 10,500 | 10,500 | 10,500 | 10,500 | 11,550 | 11,550 | 11,550 |
| Rent | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 |
| Utilities | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Accounting & Legal (Post Confirmation) | 5,500 | 5,500 | 5,500 | 5,500 | 6,000 | 6,000 | 6,000 |
| Insurance Health/Life | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Taxes (CAT, real estate, etc.) | 3,000 | 3,000 | 3,000 | 3,000 | 3,750 | 3,750 | 3,750 |
| Speedway Gas | 13,230 | 13,230 | 13,230 | 13,230 | 14,800 | 14,800 | 14,800 |
| **Total Other Expenses** | 122,713 | 122,713 | 122,713 | 122,713 | 126,583 | 126,583 | 126,583 |
| | | | | | | | |
| **Total Operating Expense** | 610,511 | 957,717 | 1,260,241 | 1,489,211 | 773,638 | 1,109,560 | 1,450,203 |
| | | | | | | | |
| **Plan Payments** | | | | | | | |
| **Administrative Expense Claims** | | | | | | | |
| Interest on DIP LOC | 3,703 | 5,684 | 5,718 | 6,182 | 1,996 | 5,739 | 5,217 |
| Chapter 11 Legal Fees | | 22,500 | 22,500 | 22,500 | 22,500 | | |
| Subchapter V Trustee Fees | | | | | | | |
| Other Accrued Expenses | | | | | | | |
| **Total Administrative Expense Claims** | 3,703 | 28,184 | 28,218 | 28,682 | 24,496 | 5,739 | 5,217 |
| | | | | | | | |
| **Cure Payments** | | | | | | | |
| Ohio Rent Cure Payments | 7,770 | | | | | | |
| Ford Van Lease Cure Payments | 4,309 | 4,309 | | | | | |
| **Total Cure Payments** | 12,079 | 4,309 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| **Classified Claim Payments** | | | | | | | |
| Class 2.1 - Senior Lender Interest | 10,200 | 10,200 | 10,200 | 10,200 | 10,200 | 10,200 | 10,200 |
| Class 2.2 - Ford Van | 1,053 | 1,053 | 1,053 | 351 | 351 | 351 | 351 |
| Class 3 - General Unsecured | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| **Total Classified Claim Payments** | 26,253 | 26,253 | 26,253 | 25,551 | 25,551 | 25,551 | 25,551 |
| | | | | | | | |
| **Total Plan Payments** | 42,035 | 58,746 | 54,471 | 54,233 | 50,047 | 31,290 | 30,768 |

2 of 3

Vanguard Wines
Plan Pro Forma

| Summary | Q4 2025 | Q1 2026 | Q2 2026 |
|---|---|---|---|
| **Cash Balance Summary** | | | |
| **Beginning Cash Balance** | 50,000 | 50,000 | 50,000 |
| Income | 2,015,663 | 636,525 | 1,166,962 |
| Operating Expenses | -1,755,943 | -924,320 | -1,109,560 |
| **Net Income (Loss) Before Plan Payments** | 259,720 | -287,795 | 57,402 |
| Less Plan Payments | -30,332 | -25,744 | -32,015 |
| **Net Income (Loss) After Plan Payments** | 229,388 | -313,540 | 25,387 |
| **Ending Cash Balance** | 279,388 | -263,540 | 75,387 |
| | | | |
| **LOC Transactions** | | | |
| **Minimum Operating Capital Reserve** | 50,000 | 50,000 | 50,000 |
| **Starting LOC Principal Balance** | 256,602 | 27,214 | 340,754 |
| Principal Payment to (Draw Down from) LOC | 229,388 | -313,540 | 25,387 |
| **Ending LOC Principal Balance** | 27,214 | 340,754 | 315,366 |
| **Cash Balance Carry Forward to Next Period** | 50,000 | 50,000 | 50,000 |
| | | | |
| **Income Detail** | | | |
| Cash Sales | 1,612,530 | 509,220 | 933,570 |
| Collections from Receivables | 403,133 | 127,305 | 233,392 |
| **Total Income** | 2,015,663 | 636,525 | 1,166,962 |
| | | | |
| **Operating Expense Detail** | | | |
| **Payroll Expenses** | | | |
| Gross wages & payroll taxes | 211,200 | 211,200 | 211,200 |
| Commissions | 120,940 | 38,192 | 70,018 |
| Payroll expenses (401(k), etc.) | 6,750 | 6,750 | 6,750 |
| **Total Payroll Expenses** | 338,890 | 256,142 | 287,968 |
| | | | |
| **Costs of Goods Expenses** | | | |
| Payments to Wine Suppliers | 1,100,000 | 500,000 | 600,000 |
| Inbound Transportation | 130,000 | 22,500 | 60,000 |
| Excise Tax | 60,470 | 19,096 | 35,009 |
| **Total Cost of Goods Expenses** | 1,290,470 | 541,596 | 695,009 |
| | | | |
| **Other Expenses** | | | |
| Ford Van Lease Expense | 5,983 | 5,983 | 5,983 |
| Misc Purchases | 15,000 | 15,000 | 15,000 |
| IT Services | 1,500 | 1,500 | 1,500 |
| Insurance PPE | 11,550 | 11,550 | 11,550 |
| Rent | 28,000 | 28,000 | 28,000 |
| Utilities | 10,000 | 10,000 | 10,000 |
| Accounting & Legal (Post Confirmation) | 6,000 | 6,000 | 6,000 |
| Insurance Health/Life | 30,000 | 30,000 | 30,000 |
| Taxes (CAT, real estate, etc.) | 3,750 | 3,750 | 3,750 |
| Speedway Gas | 14,800 | 14,800 | 14,800 |
| **Total Other Expenses** | 126,583 | 126,583 | 126,583 |
| | | | |
| **Total Operating Expense** | 1,755,943 | 924,320 | 1,109,560 |
| | | | |
| **Plan Payments** | | | |
| **Administrative Expense Claims** | | | |
| Interest on DIP LOC | 5,132 | 544 | 6,815 |
| Chapter 11 Legal Fees | | | |
| Subchapter V Trustee Fees | | | |
| Other Accrued Expenses | | | |
| **Total Administrative Expense Claims** | 5,132 | 544 | 6,815 |
| | | | |
| **Cure Payments** | | | |
| Ohio Rent Cure Payments | | | |
| Ford Van Lease Cure Payments | | | |
| **Total Cure Payments** | 0 | 0 | 0 |
| | | | |
| **Classified Claim Payments** | | | |
| Class 2.1 - Senior Lender Interest | 10,200 | 10,200 | 10,200 |
| Class 2.2 - Ford Van | | | |
| Class 3 - General Unsecured | 15,000 | 15,000 | 15,000 |
| **Total Classified Claim Payments** | 25,200 | 25,200 | 25,200 |
| | | | |
| **Total Plan Payments** | 30,332 | 25,744 | 32,015 |